**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**M.W., a Minor, Through His Mother**                                                **PLAINTIFF**
**and Adult Next Friend**
**TAMATHA MOORE-WATSON**

**VS.**                                     **CIVIL ACTION NO.: 3:19-cv-107-HTW-LRA**

**RANKIN COUNTY PUBLIC SCHOOL DISTRICT**                      **DEFENDANTS**

---

**RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

---

COMES NOW Defendant, Rankin County School District, by and through its counsel of record and files this its Response in Opposition to Plaintiff's Motion for Preliminary Injunction and in support thereof would show unto the Court the following:

**I.     Introduction**

The Rankin County School District respectfully requests that the Court deny the relief requested in the Motion for Preliminary Injunction. The Plaintiff has not met her burden of showing either a substantial likelihood of success on the merits of her claims, nor has Plaintiff demonstrated the irreparable harm that will result if the requested relief is denied.

In contrast, the District can show that the Plaintiff does not have a substantial likelihood of success on the merits and that no irreparable harm will come to the Plaintiff if this Motion is denied. Further, the District can show that the requested relief is not consistent with the public interest. Plaintiff cannot make a clear showing that Plaintiff is entitled to the requested preliminary injunction.

## II. Background

On or about September 5, 2018, Ms. Tamatha Moore Watson ("Ms. Watson"), on behalf of her son M.W. filed with the Mississippi Department of Education/Office of Special Education (MDE) a Due Process Complaint ("Complaint") pursuant to the Individuals with Disabilities Education Improvement Act (IDEA). The Rankin County School District ("District") received a copy of the Complaint on September 7, 2018. The District filed its response on September 17, 2018. Ms. Watson made numerous allegations including that the District failed to provide M.W. with a free and appropriate public education (FAPE) because the District failed to provide special education and related services related to M.W.'s alleged dyslexia disability. An impartial hearing officer was assigned by the MDE.

During the 2017-2018 school year, M.W. was enrolled in the second grade at StoneBridge Elementary School ("Stonebridge") within the Rankin County School District. During the 2017-2018 school year, M.W. began receiving special education and related services at StoneBridge based on a primary eligibility category of language/speech impaired: articulation (TH sound). Because of M.W.'s language/speech: articulation disability, M.W.'s individualized education program (IEP) included communication goals. M.W. was initially evaluated for language/speech services under the IDEA in October 2017. R. Vol. 2, p.88.

M.W. began receiving Response to Intervention (RTI) Tier 2 interventions and supports in reading in first grade. R. Vol. 2, p. 83. M.W. also received Tier 2 interventions in both math and reading during his second grade school year. R. Vol. 2, pp. 83, 88, 170. He began receiving Tier 3 interventions in reading in November 2017. R. Vol. 2, p. 84. At this time, he was provided more intensive interventions where he was pulled from the classroom 30 minutes per day by the school's interventionist. R. Vol. 2, p. 84. M.W. also had a §504 Accommodation Plan in place

2

because while Ms. Watson never expressed any concern that M.W. may need additional special education, she did request a §504 Plan. R. Vol. 2, pp. 93, 175.

On March 26, 2018, at a multidisciplinary evaluation team (MET) meeting, Ms. Watson provided the District with the results of an outside comprehensive assessment. Based on the outside assessment, M.W. did not qualify for additional special education and related services under the IDEA or MDE policy. R. Vol. 2, pp. 53-63. Further, M.W.'s achievement on the comprehensive assessment was commensurate with his IQ. R. Vol. 2, pp. 53-63.

In addition to using the outside comprehensive assessment to determine whether further assessment was needed and to determine whether M.W. needed additional special education services, on March 26, 2018, the District utilized the District's dyslexia rubric and the results of the outside assessment to determine if M.W. met criteria for dyslexia interventions. R. Vol. 2, p. 180. M.W. did not meet the criteria. R. Vol. 2, p. 80. Further, according to the results of the outside comprehensive assessment, M.W. scored within the average range in the phonological memory and rapid naming categories, areas where students with dyslexia typically have low scores. Vol. 2, pp. 215-217. The District's Tier 3 Interventionist, a certified dyslexia therapist, and M.W.'s second grade teacher observed no indicators of dyslexia when working with M.W. R. Vol. 2, pp. 120-121, 125-126, 165). Ms. Watson agreed that dyslexia therapy was not the best for M.W. at the time. R. Vol. 2, p. 200. In addition to the §504 plan, Ms. Watson agreed that M.W. should continue receiving tier 3 interventions and supports. R. Vol. 2, p. 200. The District utilized more than one measure to determine whether M.W. was entitled to additional services for dyslexia and this was done prior to the development of M.W.'s §504 plan.

School data indicated growth and progress in math and reading; however, M.W. did not meet the grade level standards. R. Vol. 2, pp. 110-112. Therefore, he was retained in the second

3

grade. R. Vol. 2, pp. 110-112. Ms. Watson withdrew M.W. from the District and enrolled him at New Summit School. Ms. Watson enrolled M.W. at New Summit on May 1, 2018, prior to receiving his final report card and prior to being informed that M.W. would be retained in the second grade. R. Vol. 2, p. 20.

M.W.'s classroom teacher at New Summit is neither certified in special education according to MDE standards nor is she trained in dyslexia services other than attending a symposium at New Summit. R. Vol. 1, p. 41. Further, M.W's classroom teacher at New Summit has never even reviewed data regarding M.W.'s alleged dyslexia diagnosis. R. Vol. 1, p. 50. M.W. has a §504 plan, similar to the §504 plan that he was provided while enrolled in the District at New Summit and does not receive special education services there. R. Vol. 1, p. 58. Further, the dyslexia therapy that M.W. receives at New Summit is provided by a staff member who is neither a licensed dyslexia therapist nor a certified teacher. R. Vol. 1, p. 80. The staff member also has no previous experience as a dyslexia therapist. R. Vo. 1, pp. 79, 80.

An administrative hearing was held in accordance with the IDEA. Testimony was taken from Ms. Watson, staff at New Summit, Stonebridge Elementary School and Rankin County School District level administrators. The following three allegations were the subject of the IDEA administrative due process hearing:

    A. Child Find – The District failed to properly evaluate the Child and therefore, did not take the appropriate steps in identifying the student who is suspected of having a disability under §300.8 and in need of special education services.

    B. The Child's Educational Placement – The District refused to change the Child's educational placement and therefore, failed to ensure the educational placement is appropriate and conforms to the Least Restrictive Environment (LRE) provisions of

      the *State Policies Regarding Children with Disabilities under the Individuals with Disabilities Education Act Amendments of 2004.*

    C. A Free Appropriate Public Education (FAPE) was not provided due to failure to provide an IEP based on appropriate evaluations.

The impartial hearing officer found in favor of the District. He specifically found that the District correctly interpreted the qualification guidelines found in the *IDEA* and *State Policies* regarding M.W.'s dyslexia ruling. And, because the Child did not meet the criteria for a dyslexia ruling, dyslexia therapy could not be offered through the District. The hearing officer found that the District satisfied all criteria related to least restrictive environment (LRE) under the IDEA and the District provided the child with a FAPE. The hearing officer further opined as follows:

> "The District was diligent in identifying the child suspected of having a disability, in properly assessing the child in a timely manner, communicating with the parents and allowing parental participation, monitoring the child's progress through the Tier system, and developing an IEP based on appropriate assessments and qualifications specified in *State Policies* and *IDEA*. Based on the evidence presented, placement and services provided by the District are appropriate, and no compelling testimony was provided that supported the argument the Child would be better served in private school."

Accordingly, Ms. Watson was not entitled to compensatory services. CM/ECF No. 1-1.

### III. Standard for Injunctive Relief

The Supreme Court has recognized that a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 376 (2008). In order to establish entitlement to temporary or preliminary injunctive relief, Rule 65 requires a balancing of and findings on the following four factors: (1) whether there exists a substantial likelihood the plaintiff will prevail on the merits; (2) whether the injunction is necessary to prevent irreparable harm; (3) whether the threat of injury to the plaintiff outweighs the harm and injunction might do

to the defendants; and (4) whether the entry of a preliminary injunction is consistent with the public interest. *Id.* at 365. Denial of an application for preliminary injunction is proper where the application falls short of meeting these factors. *City of Durant v. Humphreys County Memorial Hospital*, 587 So. 2d 244 (Miss. 1991). As set forth below, Petitioners cannot meet the requirements of Rule 65 for a preliminary injunction.

### A. The Plaintiff cannot show a substantial likelihood of success on the merits of their claims for at least the following reasons:

#### 1. *The District did not violate Child Find.*

The substantive issue of appropriate educational placement is addressed by answering a two-prong test to determine eligibility for special education services: (i) whether the student has a qualifying disability and (2) because of the qualifying disability, does the student need special education and related services. *M.P. Bnf. K.S. v. Aransas Pass Indep. Sch. Dist.*, 2016 U.S. Dist. LEXIS 18843, *13 (S.D. Tex. 2016)(citing 20 USC § 1401(3)(A)). This inquiry also supports the District's assertion that it took appropriate steps in identifying M.W. as a student suspected of having a disability.

M.W. began received Response to Intervention (RTI) Tier 2 interventions and supports in reading in first grade. R. Vol. 2, p. 83. M.W. also received Tier 2 interventions in both math and reading during his second grade school year. R. Vol. 2, pp. 83, 88, 170. He began receiving Tier 3 interventions in reading in November 2017. R. Vol. 2, p. 84. At this time, he was provided more intensive interventions where he was pulled from the classroom 30 minutes per day by the school's interventionist. R. Vol. 2, p. 84. M.W. also had a §504 Accommodation Plan in place.

Further, in October 2017, M.W.'s teacher recommended a comprehensive assessment because M.W. was having problems with the TH sound and was consistently not producing that

6

sound. R. Vol. 2, p. 88. M.W.'s teacher thought there was a possibility that the pronunciation had an adverse impact on M.W.'s performance in spelling. R. Vol. 2, p. 90.

Upon the teacher's request, M.W. was evaluated by the District's speech pathologist for speech services and Ms. Watson consented to the evaluation on October 9, 2017. The results of the assessment indicated eligibility for language-speech articulation (TH) services. Accordingly, an IEP was developed on November 8, 2017. Under his IEP, M.W. received speech therapy twice a week for thirty minutes each session and made adequate progress.

On March 26, 2018, the MET team convened to review data from the outside comprehensive evaluation provided by Ms. Watson. The data was used to determine whether M.W. was in need of an additional assessment, additional special education and related services, dyslexia services and a §504 plan. With respect to the outside comprehensive evaluation, MDE policy requires a severe discrepancy between the student's IQ and achievement. A severe discrepancy is defined as 1.5 standard deviations below the measure of intellectual ability for specific learning disabilities. Dyslexia can be a specific learning disability under MDE criteria. *(State Board Policy Chapter 74, Rule 19).* However, the data included in the results of the outside comprehensive evaluation simply did not meet MDE's criteria for a specific learning disability. According to the comprehensive assessment M.W.'s IQ or intellectual ability is a 90. R. Vol.2, p. 54. The independent evaluator admitted that the results of the comprehensive assessment did not indicate a severe discrepancy as required by State Board Policy 7219. R. Vol. 2, pp. -53-63.  She further admitted that M.W.'s achievement on the comprehensive assessment was commensurate with his IQ. R. Vol. 2, pp. 53-63. Further, M.W. scored within the average range in the phonological memory and rapid naming categories, areas where students with dyslexia typically have below scores. R. Vol. 2, pp. 215-217.

In addition to using the outside comprehensive assessment to determine whether further assessment was needed and to determine whether M.W. needed additional special education services, on March 26, 2018, the District utilized the District's dyslexia rubric and the results of the outside assessment to determine if M.W. met criteria for dyslexia interventions. R. Vol. 2, p. 180. M.W. did not meet the criteria. R. Vol. 2, p. 80. The District took appropriate steps and did not violate Child Find. There is no substantial likelihood whatsoever that Plaintiff will prevail on the merits of this claim.

### 2. *The District provided M.W. with a FAPE*.

In order to comply with the IDEA's FAPE mandate, a school district must provide a disabled student access to education that is "sufficient to confer some educational benefit." *Board of Educ. Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 201 (1982). The IDEA requires that a school district provide a disabled student a "basic floor of opportunity" whereby "specialized instruction and related services which are individually designed to provide education benefit" are bestowed upon the disabled child. *Id.* at 201. The school district" need not provide its disabled students with the best possible education, nor one that will maximize the student's educational potential." *Houston Indep. Sch. Dist. v. V.P.*, 582 F. 3d at 583 (*citing Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F. 3d 245, 247 (5th Cir. 1997)). "Nevertheless, the educational benefit to which [IDEA] refers and to which an IEP must be geared cannot be a mere modicum or de minimus; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement." *Michael F.*, 118 F. 3d at 248. "In short, [a school district] must provide its students with 'meaningful' educational benefit." *Houston Indep. Sch. Dist. v. V.P.*, 582 F. 3d at 583. Four factors are examined under the FAPE analysis: whether (1) the program is individualized on the basis of the student's assessment and

performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key stakeholders; and (4) positive academic and non-academic benefits are demonstrated. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F. 3d 245, 253 (5th Cir. 1997).

M.W.'s 2017-2018 IEP included individualized accommodations and modification based upon his assessment and performance. The IEP goals were written in order to accommodate his qualifying disability. M.W. was educated in the general education setting with his nondisabled peers. Services were provided in a coordinated and collaborative manner by key stakeholders. Ms. Watson was present, included and allowed input at IEP meetings, Tier meetings, MET meetings and Section 504 meetings. The MET team considered the results of the outside comprehensive assessment provided by Ms. Watson. Further, M.W. demonstrated growth throughout the 2017-2018 school year on STAR and i-Ready curriculum-based assessments in both reading and math. R. Vol. 2, p. 96-102. While he was retained, his reading level did increase from a J to an M. R. Vol. 2, p. 110. The District provided M.W. with a FAPE and Plaintiff cannot prevail on the merits of this claim.

**3. *Plaintiff is not entitled to compensatory services and is not entitled to payment and/or reimbursement of any tuition fees associated with placement at New Summit.***

Case law is clear that a parent who unilaterally places a child in a private school, as Ms. Watson has done, is entitled to payment of tuition associated with the private school placement *only* when a school district fails to provide a FAPE and the private school placement is appropriate. *School Comm. of Burlington v. Department of Ed. of Mass.*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985). The District provided M.W. with a FAPE. Furthermore, New Summit is not an appropriate placement for M.W. M.W.'s classroom teacher at New Summit is neither certified in special education according to MDE standards nor is she trained in dyslexia

services other than attending a symposium at New Summit. R. Vol. 1, p. 41. Further, M.W's classroom teacher at New Summit has never even reviewed data regarding M.W.'s alleged dyslexia diagnosis. R. Vol. 1, p. 50. M.W. has a §504 plan, similar to the §504 plan that he was provided while enrolled in the District, at New Summit and does not receive special education services there. R. Vol. 1, p. 58. Further, the dyslexia therapy that M.W. receives at New Summit is provided by a staff member who is neither a licensed dyslexia therapist nor a certified teacher. R. Vol. 1, p. 80. The staff member also has no previous experience as a dyslexia therapist. R. Vo. 1, pp. 79, 80. The District currently has no students placed at New Summit for this very reason, due to its lack of qualified teachers, lack of rigor and poor instructional practices. R. Vol. 3, pp. 209-218. Plaintiff simply cannot prevail on the merits of this claim.

    **B. The Plaintiff cannot show any irreparable harm; that the threat of injury to the Plaintiff outweighs the harm an injunction might do to District; or that the injunction serves the public interest.**

Plaintiff can show no irreparable harm if her preliminary injunction is not granted. Contrarily, M.W. will be harmed if he remains at New Summit as it is not an appropriate placement. Also, the Plaintiff cannot show the threat of injury to the Plaintiff outweighs the harm an injunction might do to the District. In contrast, the District will be harmed if forced to fund an inadequate and inappropriate education when the District can provide M.W. with an appropriate placement and services. Further, an injunction requiring the District to fund an inadequate and inappropriate private education does not serve the public interest. Allowing M.W. to be continuously underserved in the private placement setting serves neither his best interest nor the public interest. The balance of equities and public interest weigh against the preliminary injunction sought by the Plaintiff. Under these circumstances, the equities and public interest strongly favor the District.

### C. M.W.'s current educational placement under 20 U.S.C. §1415(j) is the Rankin County School District and is not New Summit.

M.W.'s current educational placement is not New Summit. Case law is plain that the "hearing officer's placement decision is an agreement between the parent and State for purposes of funding private placement during the …. appeal of that decision." *Klein Indep. Sch. Dist. v. Per Hovem*, 2010 U.S. Dist. LEXIS 26758, *10 (S.D. Tex. 2010) (*citing* 34 C.F.R. §300.518(d)). The private school placement is the current educational placement under 20 U.S.C. §1415(j) only if the administrative decision favors the parents who have placed their child in a private school after rejecting a proposed IEP. *Houston Indep. Sch. Dist. v. VP*, 582 F. 3d 576, 591 (5th Cir. 2009) (*citing Burlington*, 471 U.S. at 371-72)).  A school district is then required to pay for a student's private school placement from the point of the administrative decision forward. *Id.* at 592 *(citing Susquenita Sch. Dist. v. Raelee S*., 96 F.3d 78, 84 (3d Cir. 1996)).

However, this is not the case in this matter. The hearing officer in the case at bar was transparent that placement at New Summit is not appropriate. The hearing officer further opined that placement and services provided by the District were appropriate. *See CM/ECF* No. 1-1, pg. 14. The hearing officer found that Ms. Watson was not entitled to reimbursement for compensatory services and/or compensatory education. *See CM/ECF* No. 1-1, pg. 16. Because the hearing officer's decision that New Summit is not appropriate and the Districts services and placement are appropriate, M.W.'s current educational placement under 20 U.S.C. §1415(j) is the Rankin County School District and not New Summit. Accordingly, the District cannot be required to provide payment for placement at New Summit during the pendency of this matter as it is not the current educational placement. Plaintiff's requested relief should be denied.

### IV. Conclusion

WHEREFORE PREMISES CONSIDERED, the Rankin County School District

respectfully requests that the Court deny Petitioner's Motion for Preliminary Injunction, with prejudice. The District prays for any other relief the Court deems appropriate.

Respectfully submitted this the 7th day of May, 2019.

**RANKIN COUNTY SCHOOL DISTRICT**

By: /s/ KaShonda L. Day
*One of Their Attorneys*

OF COUNSEL:

KaShonda L. Day, Esq. (MS Bar No. 103144)
James A. Keith, Esq. (MS Bar No. 3546)
ADAMS AND REESE LLP
1018 Highland Colony Parkway, Suite 800
Ridgeland, MS 39157
KaShonda L. Day Telephone: 601-292-0785
James Keith Telephone: 601-292-0718
Facsimile: 601-355-9708
Email: kashonda.day@arlaw.com
       jim.keith@arlaw.com

## **CERTIFICATE OF SERVICE**

      I, KaShonda L. Day, do hereby certify that I have this day electronically the above and foregoing document with the Clerk of the Court using the ECF system which sent notification of such filing to all counsel of record.

      Dated:  May 7, 2019

      /s/ KaShonda L. Day
      KaShonda L. Day, Esq.